UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES of AMERICA ) | |
| ) | |
| vs. ) | No. 23-cr-230-TJK |
| ) | |
| BRIAN HEALION, ) | |
| ) | |
| Defendant. ) | |

DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Brian Healion has pled guilty to one count of civil disorder, in violation of 18 U.S.C. §231(a)(3), for his role in the events at the United States Capitol on January 6, 2021. He respectfully submits this Memorandum in Aid of Sentencing.

Brian Healion is a young man – 30 years old on January 6, 2021 – from Philadelphia. He takes full responsibility for his acts, and recognizes that punishment is appropriate. For the reasons stated below, Mr. Healion respectfully suggests that a sentence of probation, with community service, is appropriate here.

ARGUMENT

The Court must impose a sentence "sufficient, but not greater than necessary," to comply with the following purposes:

(A) to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a).  In so doing, the Court should consider, *inter alia,* the nature and circumstances of the offense, the defendant's history and characteristics, the kinds of sentences available, the kinds of sentence and the sentencing range established by the Guidelines, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. §3553(a)(1), (3), (4) & (6).  Mr. Healion respectfully submits that consideration of these factor here leads to the conclusion that a sentence of probation, with community service, is appropriate.

I.  Factors to Be Considered

   A.  The Nature and Circumstances of the Offense

Mr. Healion has pled guilty to one count of Civil Disorder, for "obstruct[ing], imped[ing], or interfer[ing] with" law enforcement officers at the Capitol on January 6th, 2021.  18 U.S.C. §231(a)(3).  On that day, he knowingly entered restricted space at the U.S. Capitol.  PSR ¶41. He then interfered with police efforts to control the crowd by grabbing a bike rack the officers were using as a barrier, and attempting to pull it way from officers.  PSR ¶45.  He then entered the Capitol, and Senator Jeff Merkley's "hideaway office," where he posed for pictures.[1]  PSR ¶¶49-50.  After about 20 minutes, he exited the building.[2]  PSR ¶51.

---

[1] The government does not allege that any of Mr. Healion's conduct in Senator Merkley's office violated 18 U.S.C. §231(a)(3).

[2] The PSR notes that Mr. Healion was a member of a local chapter of the Proud Boys, and that he came to the Capitol on January 6th with other members.  PSR ¶¶20, 30-32.  The PSR also asserts that members of the Proud Boys "routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group."  PSR ¶20.  However, Mr. Healion is not charged with conspiracy, and the First Amendment "proscribes punishment of an individual for membership in a protected organization unless the organization has illegal aims and the individual intends to further those aims."  *United States v. Lemon,* 723 F.2d 922, 939-40 (D.C. Cir. 1983).  Thus, Mr. Healion's association with the Proud Boys should not be considered in determining his sentence.

B. Brian Healion's History and Characteristics

Brian Healion was born in Queens, New York, on March 27, 1990, the child of Dennis Gavin and Barbara Carrano. The couple were not married, and Ms. Carrano married Michael Healion when Brian was a child. Ms. Carrano and Mr. Healion divorced when Brian was five years old, and Ms. Carrano resumed her relationship with Brian's father. The family moved to Pennsylvania when Brian was 13, and Brian's mother and father married in 2022.

Brian's father – who worked as a roofer – suffers from emphysema and receives Social Security disability payments. His mother – who worked for the United States Postal Service – receives Social Security disability payments for a knee injury. Brian helps to support her financially. Brian has two brothers, two half-brothers, and two half-sisters.

Brian has been employed by The Fresh Grocer since 2008. After working 8 years as a Deli Associate and Produce Associate, he was offered the opportunity to become a produce manager and did so. Several years later, he took on a Store Management role at the company, becoming a Perishable Assistant Manager, a position at which the company's CEO says he "excels in and holds to this day." *See* Exh. A.

Mr. Healion is unmarried, but has two small children, Thomas (3) and Abigail (2), with his former fiancé, Jerica Gray. Ms. Gray suffers from bipolar disorder and post-traumatic stress disorder (caused by childhood trauma), and has been admitted to a mental health facility on several occasions. The relationship between Mr. Healion and Ms. Gray has been turbulent, but they have negotiated an agreement to share custody, in which they alternate weeks in caring for the children.

Brian's mother describes him as a "natural caregiver," whose children are "the center of his world." Exh. B. Ms. Gray says, "he puts God, Family and Work as his main priority." Exh. C. His brother-in-law, Daniel Hunter, describes him as a "good person, ... a caring friend

3

and family member," who has "continued to grow as an individual and become a caring and compassionate father over the past few years." Exh. D.

Mr. Healion has been arrested several times, once for possession of a controlled substance, and three times for disorderly conduct or "public drunkenness [or] similar conduct." PSR ¶¶80-82. However, the most recent of those offenses occurred more than 12 years ago, in April 2012. *Id.* Mr. Healion has had no contact with the criminal justice system since then.[3] Instead, he has embarked on a career path that has seen him "excel" and be rewarded with multiple promotions.

Timothy Brown, the Chief Operating Officer of Brian's employer, has written that he "consider[s him]self a mentor to Brian," whom he describes as "extremely focused on his work." Exh. A. He writes that on the morning he learned of Brian's arrest in this case, he drove to Brian's house and "had a long discussion" with Brian, who was, he said, "extremely apologetic" and "understood my position as his employer that I would need to make a hard decision as to his future with our company." Mr. Brown says that he told Brian that "he would have to rebuild his relationship with his co-workers and convince them that he is not the person that the media was portraying him to be," and that "[i]f he was unable to do this I would have to strongly consider removing him from my management team." According to Mr. Brown, Brian:

> [T]ook this initiative head on, had hard conversations with many people and to this day he has regained their trust and is one of the most well liked managers in the store because of his willingness and ability to help people through challenges throughout their day.

---

[3] As the PSR notes, Mr. Healion satisfied the terms of his probation in connection with the drug offense. PSR ¶78. The PSR lists three "active bench warrants" for offenses occurring between 2009 and 2012, *id.* ¶¶80-82, but Mr. Healion has recently satisfied these warrants.

4

Mr. Brown states that Brian has "worked tremendously hard to rebuild" his character since January 6th, and says that he has "stood by [Brian] throughout this process and will continue to do so in the future."

Walt Suenderhaft, a Store Director for whom Brian works as Assistant Manager, had this to say about Brian:

> Brian was selected to be promoted to assistant Store Manager because he is one of our most dedicated and capable managers. Brian is focused and driven to succeed. He strives to learn everything he can to improve his own personal performance. Brian is both excellent as a produce manager and now as an assistant store manager. He gets along well with both associates and management and seeks opportunities to improve our store where possible. I know Brian to be a caring and responsible leader in our operation as well as taking care of his family making personal sacrifices working extra jobs to provide for his family.

Exh. E.  Mr. Suenderhaft continues:

> Brian is a good man a good father as well as a good leader at work. He is a passionate individual who gives 100% to whatever task is in front of him. I believe he knows that his involvement was not a good decision. I believe he understands the risk he has out his family in, The risk to his employment and the impact on his reputation. He has survived this with all of us, his working family and his own family. This really says a lot about his reputation with all of us because we are 90+% democrats and African American.

*Id.*

### C. Available Sentences Under the United States Sentencing Guidelines

The starting point of any federal sentencing proceeding is calculating the applicable Guidelines range, which serves as the "initial benchmark" in determining an appropriate sentence. *United States v. Abukhatallah*, 41 F.4th 608, 643 (D.C. Cir. 2022).  As indicated in the PSR, the appropriate Guidelines Offense Level here is 8, and that his Criminal History category is I, PSR ¶¶ 73, 76, which results in a recommended Guideline range of 0-6 months' incarceration.  Because Mr. Healion's Offense Level is in Zone A of the Sentencing Table, the Guidelines authorize a sentence of Probation.  U.S.S.G. §5B1.1(a)(1).

D. The Need to Avoid Unwarranted Sentencing Disparities

The Probation Office asserts that a sentence of 3 months' imprisonment "is warranted due to the nature and circumstances of the instant offense, and avoids unwarranted sentence disparity among similarly situated offenders." Sentencing Recommendation (June 6, 2024) [ECF No. 70]. But a sentence of 3 months' imprisonment is not warranted here, and rather than avoiding sentencing disparity, would create it.

The Probation Office asserts that:

> During the last five fiscal years (FY2019-2023), there were 95 defendants whose primary guideline was §2A2.4, with a Final Offense Level of 8 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 58 defendants (61%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 4 month(s) and the median length of imprisonment imposed was 2 month(s). For all 95 defendants in the cell, the average sentence imposed was 3 month(s) and the median sentence imposed was 1 month(s).

PSR ¶147. But U.S.S.G. §2A2.4 applies not only to 18 U.S.C. §231(a)(3), but also to more serious offenses, including 18 U.S.C. §111 (assaulting a law enforcement officer). The Probation Office's analysis makes no distinction between defendants sentenced for violations of 18 U.S.C. §231 and those sentenced for violations of more serious crimes.

A more relevant analysis would compare Mr. Healion's acts on January 6th to those of similarly situated January 6th defendants who have pled guilty to and been sentenced for a violation of 18 U.S.C.§231(a)(3). That comparison makes clear that the sentence advocated by the Probation Office is not warranted. Two January 6th defendants have received sentences of 3 months' imprisonment for violating 18 U.S.C. §231(a)(3). Each engaged in conduct significantly more serious than Mr. Healion's.

Jessica Reyher entered the Lower West Terrace Tunnel "within one minute of rioters smashing through the glass doors." Government's Sentencing Memorandum, *United States*

6

*v. Jessica Reyher,* No. 23-cr-138-RBW (Feb. 20, 2024) [ECF No. 140] at 7-8. She "quickly pushed [her] way to the front of the pack of rioters in the tunnel," and refused to obey officers' orders to leave. *Id.* at 8-9. She "remained at the front of the mob," which "began coordinated pushes against the officers." *Id.* at 10, 12. She then exited the tunnel, but came back in and "joined the assault and used [her] body weight to physically push in unison with the rioters into the officers." *Id.* at 15. After exiting the tunnel a second time, she returned again, and "joined the collective efforts to push against the police line," and became part of a "mob" that "crushed" an officer. *Id.* at 16-17.

Derrick Evans – a former West Virginia state legislator – also received a sentence of 3 months' imprisonment for violating 18 U.S.C. §231(a)(3). Prior to January 6th, Mr. Evans encouraged others to come to D.C. on January 6th to "take America back." Government's Sentencing Memorandum, *United States v. Evans,* No. 21-cr-337-RCL (June 15, 2022) [ECF No. 47] at 6-7. On January 6th, Mr. Evans was not only "part of the mob that assaulted police officers to gain entry to the Capitol building;" he was a "leader" of the crowd, "promot[ing] … the riot" and "stok[ing] the crowd." *Id.* at 2, 27, 29. He livestreamed from inside the crowd at the Capitol, cheering, shouting "[w]e took it over," and exhorting others not to leave the building. *Id.* at 13, 15. He "continuously encouraged other rioters forward," and "threat[ened]" police officers by telling them "to just let the rioters into the building to avoid violence." *Id.* at 27-28.

Mr. Healion's conduct on January 6th is more akin to – and, in fact, less serious than – that of other January 6th defendants who have received sentences of probation for violating §231(a)(3). Timothy Allen Hart pled guilty to violating §231(a)(3). *United States v. Hart,* No. 21-cr-540-PLF (April 26, 2023) [ECF No. 59]. According to the Government's Sentencing

7

Memorandum in that case, Hart joined a crowd that had gathered at the barricades that had been erected at the Peace Circle. Then:

> Amidst screams of profanity towards officers and politicians, rioters on the end of that barricade opposite Hart violently engaged with U.S. Capitol Police officers and began rocking and shoving the barricades. Hart joined the other rioters and pushed one such barricade with his hands and his foot, helping to overrun the security checkpoint …. The rioters, including Hart, breached the barricades, hopping over the downed fence and forcing officers to retreat. Hart then joined a multitude of other rioters in rushing onto the restricted area of Capitol grounds. … Despite encountering additional lines of police officers and pepper spray, Hart continued with the mob to overrun law enforcement and move closer to the Capitol building. … Having breached the police lines, Hart then encouraged other rioters to move towards the Capitol.

Government's Sentencing Memorandum, *United States v. Hart*, No. 21-cr-540-PLF (July 20, 2023) [ECF No. 69) at 5-8. Sometime later, Hart entered the Capitol building and "wander[ed] through the halls … until he reached the Rotunda," where he "stopped and smoked marijuana," posting on Instagram a video of himself doing so. After 21 minutes inside, he exited the building. *Id.* at 9-12.

At sentencing, the government asked for 4 months' incarceration. The Court, however, sentenced Hart to 36 months' probation, with 60 hours of community service, and 45 days' home confinement. Judgment, *United States v. Hart*, No. 21-cr-540-PLF (Aug. 2, 2023) [ECF No. 74) at 2-4.

Brian Preller also pled guilty to violating §231(a)(3) on January 6th. According to the government, Preller came to Washington as a member of a group known as "Guardians of Freedom" ("GoF"), which, the government stated, is "loosely affiliated with the Three Percenters."[4] Government's Sentencing Memorandum, *United States v. Preller*, No. 23-cr-45-TNM (Sept. 6, 2023) [ECF No. 90) at 2. According to the government:

---

[4] The government wrote that, according to the Anti-Defamation League:

8

> Preller and several other members of [GoF] traveled in a military formation while on restricted grounds of the U.S. Capitol. Preller wore large goggles and a green helmet with the word "monster" on the back in white. He also wore a green tactical vest that carried what appeared to be a chemical irritant spray in the front. Preller possessed a black walking stick. … Preller joined a group of rioters who attempted to force their way past the officers responsible for securing the tunnel entrance to the Capitol Building. Preller approached the Tunnel area [and] watched as other rioters attacked police in the Tunnel. Either Preller, or someone standing near Preller, shouted "make a hole," as he moved to the entryway where rioters were fighting police. As he was moving toward the Tunnel, Preller carried the black walking stick. By approximately 4:15 p.m., Preller was in the Tunnel, holding what appeared to be a can of chemical irritant. Preller gestured with his hand, apparently to someone on the front line. He later put his head down in what appears to be an effort to brace forward. Preller then joined the other rioters in their efforts to push against the line of officers inside the Tunnel.

*Id.* at 3-6. Following the riot, Preller "posted several statements on social media, taking credit for his actions on January 6, 2021," including the statement that he was "[c]ontuining to build my 3% army so I can overthrow the federal government." *Id.* at 7.

At sentencing, the government asked for 8 months' incarceration. The Court, however, sentenced Hart to 60 months' probation, with 40 hours community service and 8 months of home confinement. Judgment, *United States v. Preller,* No. 23-cr-45-TNM (Sept. 14, 2023) [ECF No. 101] at 2-4.

---

> Three Percenters are part of the militia movement, which supports the idea of a small number of dedicated "patriots" protecting Americans from government tyranny, just as the patriots of the American Revolution protected early Americans from British tyranny. The Three Percenter concept, created in 2008, is based on an inaccurate historical claim that only three percent of Americans fought in the Revolutionary War against the British. Three Percenters may join or form traditional militia groups but often form non-paramilitary groups or online networks. Many are not associated with any particular groups. The Three Percenter concept both contributed to and benefited from the resurgence of the militia movement that began in 2008.

Government's Sentencing Memorandum, *United States v. Preller,* No. 23-cr-45-TNM (Sept. 6, 2023) [ECF No. 90] at 2 n.2.

9

Eric Gerwatowski came to the Capitol on January 6, 2021, because he believed the election had been stolen, and "the commies are trying to steal the country." Government's Sentencing Memorandum, *United States v. Gerwatowski,* No. 22-cr-125-JMC (Feb. 16, 2023) [ECF NO. 29] at 6.   In "plain sight" of police officers, Mr. Gerwatowski "pulled open one of the doors the Capitol Police had just closed . . . [,] turned to the crowd and yelled 'Let's Go!' and directed more rioters inside the Capitol." *Id.* at 3-4; *see also Trump supporters, Capitol Building in DC, woman shot and killed* (YouTube video) (time stamp 10:40), available at https://www.youtube.com/watch?v=DryUBiO8yL0.   According to the government, "Gerwatowski's actions directly led to over a dozen rioters enter[ing] the building." *Id.* at 4.   On those facts, the government recommended 3 months' incarceration, but the Court imposed a sentence of 24 months' probation, with 60 hours community service and 30 days of home confinement.  Judgment, *United States v. Gerwatowski,* No. 22-cr-125-JMC March 10, 2023) [ECF No. 34] at 4-6.

In contrast to these defendants Brian Healion did not "violently engage[]" with police, or participate in "overrun[ning]" a security checkpoint.  Nor did he carry chemical irritant or weapon, such as a stick, or "push against" police officers.  And he did not pull open a door police had just closed, allowing others access to the building.  Instead, Mr. Healion attempted to pull a bike rack from a police officer's hand.  Mr. Healion recognizes that this act was unlawful, and that punishment is appropriate, but he respectfully submits that a punishment more severe than that imposed in these other cases is unjustified, and would create unwarranted disparities between sentences for similar conduct.

Mr. Healion also notes that the conditions of probation imposed in each of these cases included a term of home confinement.  Mr. Healion respectfully submits that this condition is not warranted in this case because his conduct was less serious than that of the defendants

10

in these other cases. However, Mr. Healion respectfully requests that, should the Court determine that some term of confinement is appropriate, it impose home confinement, so that he may continue to perform his job and care for his children.

## II. A Sentence of Probation and Community Service is "Sufficient, but not Greater than Necessary" to Effect the Purposes of Sentencing.

Although hundreds of people were involved in the events of January 6, 2021, each of them must be sentenced "based on their individual conduct." *See* Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-0139-TNM (Dec. 13, 2021) [ECF NO. 49] at 10. In sentencing January 6th defendants, the Court should "assess [their] conduct on a spectrum," considering a number of factors, including:

1. whether, when, and how the defendant entered the Capitol building;
2. whether the defendant encouraged violence;
3. whether the defendant encouraged property destruction;
4. the defendant's reaction to acts of violence or destruction;
5. whether during or after the riot, the defendant destroyed evidence;
6. the length of the defendant's time inside of the building, and exactly where the defendant traveled;
7. the defendant's statements in person or on social media;
8. whether the defendant cooperated with, or ignored commands from law enforcement officials; and
9. whether the defendant demonstrated sincere remorse or contrition.

*Id.* Mr. Healion does not suggest that he was a "mere tourist"[5] on January 6th – his conduct that day was unlawful. But considering these factors, and locating his conduct on this spectrum, Mr. Healion respectfully submits that a sentence of probation is appropriate.

---

[5] *See* Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-0139-TNM (Dec. 13, 2021) [ECF NO. 49] at 2.

11

Brian Healion entered the Capitol Building on January 6th, but he did not break any windows or doors to do so; he followed the crowd inside. While inside, he entered Senator Jeff Merkley's hideaway office, but he damaged nothing in the office, and took nothing from it.[6] He remained in the Capitol for approximately 20 minutes. He neither encouraged nor participated in any violence or property destruction. He destroyed no evidence on January 6th, and has destroyed no evidence since then. Apart from the action that is the basis for the charge against him, there is no evidence that he disobeyed or interfered with law enforcement. And he has shown sincere remorse and contrition, promptly accepting responsibility, and pleading guilty.

Mr. Healion did make posts to social media concerning January 6th. As the PSR notes, between December 30, 2020, and January 5, 2021, he participated in a Telegram chat group in which members of the Proud Boys discussed plans to come to Washington, D.C., on January 6th. As the PSR notes, this chat group had more than 50 members, and although the PSR quotes a number of inflammatory statements from others in the group, Mr. Healion's contribution was minor, and unprovocative. On one occasion, he asked about the timing of events on January 6th,[7] and on another, he asked what gear he needed to buy. PSR ¶28.

1. **A Sentence of Probation Would Reflect the Seriousness of The Crime, Promote Respect for the Law, and Provide Just Punishment for the Offense.**

Mr. Healion respectfully submits that a sentence of probation would reflect the seriousness of his actions, promote respect for the law, and provide just punishment for his

---

[6] The government does not allege that any of Mr. Healion's conduct in Senator Merkley's office violated 18 U.S.C. §231(a)(3).

[7] In this post, Mr. Healion also asked "are we planning for either an unlikely joyous moment of pence [sic] growing balls?" PSR ¶28.

offense. He recognizes that a sentence of probation would fall at the low end of sentences imposed to date in cases where defendants have pled guilty to a violation of 18 U.S.C. §231(a)(3). But as discussed above, Mr. Healion's conduct is of a piece with that of similarly situated January 6th defendants who have received probationary sentences.

2. **A Sentence of Probation Would Afford Adequate Deterrence to Criminal Conduct, and Would Protect the Public.**

It is difficult to imagine the unique circumstances of January 6, 2021, occurring again, and it is equally difficult to imagine Brian Healion being involved in any future criminal conduct. As discussed above, Mr. Healion has had several run-ins with the criminal justice system, but the most recent of these occurred nearly half his lifetime ago, in 2012. And since then, he has pursued a career that has led to multiple promotions, and at which he "excel[s]." And he is focused on caring for his children. As his Store Director put it, "he knows that his involvement [in January 6th] was not a good decision[,] … [and] he understands the risk he has out his family in, [t]he risk to his employment and the impact on his reputation."

3. **No Confinement is Required to Provide Mr. Healion with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment.**

After some scrapes with the law as a young man, Brian Healion has spent his adulthood – the last dozen years of his life – becoming a man who "excels" at his job, where he has received multiple promotions, and a dedicated caregiver to his children. He helps to support his disabled mother. As his supervisor described him, he is "a good man a good father as well as a good leader at work." Incarceration would not provide him with any needed training, medical care, or other treatment; instead, it would disrupt the steadily upward arc of his life.

## CONCLUSION

Brian Healion recognizes that his actions on January 6, 2021, were unlawful. He accepts responsibility for those actions, and understands the need for punishment. However,

he respectfully suggests that a probationary sentence with community service is appropriate in his case. Given Brian's character, and the circumstances surrounding his actions on January 6, 2021, incarcerating him would provide little, if any, benefit to him or to the community as a whole, while community service would allow him to atone for his actions by making a positive contribution to society.

For all the foregoing reasons, Mr. Healion respectfully submits that a term of probation, with community service, is the appropriate sentence in this case.

Dated: June 25, 2024                                  Respectfully submitted,


                                                      /s/ Paul F. Enzinna
                                                      D.C. Bar No. 421819
                                                      Ellerman Enzinna Levy PLLC
                                                      1050 30th Street, NW
                                                      Washington, DC 20007
                                                      202.753.5553
                                                      penzinna@eellaw.com

                                                      *Counsel for Defendant Brian Healion*

## CERTIFICATE OF SERVICE

I certify that on June 25, 2024, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

Dated:  June 25, 2024                    Respectfully submitted,

  /s/ Paul F. Enzinna
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@eellaw.com

*Counsel for Defendant Brian Healion*