**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-230 (TJK)** |
| **BRIAN HEALION** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brian Healion to fifteen months' imprisonment, 36 months' supervised release, restitution in the amount of $2000, and the mandatory assessment of $100. The government recommends an nine-month upward variance because Healion, a close associate of Zachary Rehl, knew about the certification taking place on January 6, 2021, joined the hand-selected group of Proud Boys who pledged to follow leadership's commands no matter what and discussed violently storming the Capitol—and then acted in accordance with those plans, breaching the Capitol together with other Proud Boys, struggling against the police, and joining with Rehl to enter the Capitol and pose for victory photographs in a Senator's office.

## I.     INTRODUCTION

Healion participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than

one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

As set forth in the Statement of Offense, Healion, a grocery store manager, came to the Capitol with a group of Proud Boys members from Philadelphia, including Zachary Rehl, who has been convicted of seditious conspiracy and other offenses, where they interfered with law enforcement officers' efforts to protect the Capitol and obstruct the Electoral College certification on January 6. ECF No. 64 ¶¶ 13-29. Healion was a member of the "Ministry of Self Defense" (MOSD), a select group of Proud Boys who discussed potential violence on January 6 and storming the Capitol, and agreed to follow their leaders' commands that day.   Healion was well aware of the certification, and actively engaged in preparations to further the group's mission (including by volunteering blood type information in advance of January 6). He traveled to Washington with Rehl, marched to the Capitol with the Proud Boys, and interfered with police officers establishing a line on the West Front of the Capitol—the scene of the most violent confrontations between police and the mob. *Id*. at ¶¶ 18-20, 31-33. After spending over an hour on the West Front, Healion agreed to enter the Capitol Building as a unit with Rehl and other members of his chapter, where they celebrated their achievement by posing with what appears to be a rolled joint in Senator Merkley's hideaway office. *Id*. at ¶¶ 37-39. After January 6, Healion joined with other Proud Boys in lamenting that others did not want to take things "to the next level." *Id*. at ¶

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

42.

The government recommends that the Court sentence Healion to 15 months of incarceration for his conviction of 18 U.S.C. § 231(a)(3). The recommended variance recognizes the aggravating nature of Healion's coordinated effort and knowledge and intent regarding the certification.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 64, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Healion's Role in the January 6, 2021 Attack on the Capitol

Brian Healion was a member of the Philadelphia Proud Boys[2] chapter. Between at least November 2020 and January 2021, the President of the Philadelphia chapter was Zachary Rehl, and other members of the chapter included Freedom Vy and Isaiah Giddings, both of whom have also pleaded guilty for their roles in the events of January 6.

---

[2]  As Healion acknowledged in the Statement of Offense, The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence committed by members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.   Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location. ECF 64 ¶¶ 8-9.

3

On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event to be held in Washington, D.C., on January 6, 2021, the date coinciding with Congress's Certification of the Electoral College vote. After this announcement, a handful of Proud Boys members created a new chapter that would consist of members from across the country, not just a single locality. The new chapter was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Proud Boys national chairman Enrique Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members."

The next evening, Tarrio created a group called MOSD on an encrypted messaging application, which included other leaders and members of the Proud Boys.[3]

Tarrio and other MOSD leaders then began to recruit individual Proud Boys for membership in the MOSD. MOSD members were chosen for two crucial traits: the discipline to follow orders from leadership and the penchant to employ street violence against the Proud Boys' perceived adversaries. To achieve the MOSD's goals, certain rules were implemented. First, the group would be made up exclusively of "hand selected" members who were specifically chosen by the MOSD leadership. *United States v. Nordean,* 21-cr-175 (TJK), Trial Ex. 500-69 (Exhibit 1). Second, the group was subject to strict secrecy requirements, with members forbidden from discussing it with outsiders or even with other Proud Boys. *Id.* Ex. 613-P (Exhibit 2). Third, the members were required to observe the chain of command both by following direct orders without question (in one leader's words, "turn your brains off and follow") and by conforming at all times to the general norms and expectations set by leadership ("fit in or fuck off"). *Id.* Ex. 613-E (Exhibit

---

[3] Between December 30, 2020, and January 6, 2021, there were multiple related Proud Boys chats whose names included "MOSD." The primary MOSD chat for members had more than 50 members.

3) and 503-3 (Exhibit 4). Members were admonished for discussing subjects that did not, in the leaders' view, advance the "mission" of the group. *See id.* Ex. 503-1 (Exhibit 4) and 505-20 (Exhibit 5).

One recurring topic that did *not* draw any such rebuke — and which therefore received tacit approval from the leadership — was the celebration of violence as a means to advance the Proud Boys' political agenda. *See, e.g., id.* at 503- 13 (Exhibit 6) ("Represent, countrywide. Storm everyone's capitals."). In fact, messages exchanged among MOSD members on Telegram discussed plans to come to Washington, D.C., for January 6 and the potential for violence at the Capitol that day. For example, on January 2, one user wrote: "Fuck peace." On January 3, one user noted "1776 flag flying over the White House last night." Another responded, "Gonna be war soon," and "Yes Sir time to stack those bodies in front of Capitol Hill," to which another user responded with the Proud Boys slogan "Uhuru!"[4] A different user posted: "Also this ☝️ . So are the normies and 'other' attendees going to push thru police lines and storm the capitol buildings? A few million vs A few hundred coptifa should be enough. I saw a few normie groups rush through police lines on the 12th."

On January 4, MOSD members exchanged additional encrypted messages on Telegram that discussed attacking the Capitol on January 6. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, a leader of the MOSD wrote, "They would do nothing because they can do nothing." Another message stated, "It's time to end these crooked thieving fake ass politicians career… They all must leave whether it be The police [or] us citizens dragging them out by their hair."   On

---

[4] "Uhuru" is a Swahili word meaning "freedom" or "independence."

January 5, in a new version of the MOSD chat group, another user sent a message with instructions for the next day: "Everyone needs to meet at the Washington Monument at 10am tomorrow morning! Do not be late! Do not wear colors! Details will be laid out at the pre meeting! Come out []as patriot!" Another user told the others to "stand by for the shared baofeng [radio] channel and shared zello channel, no colors, be decentralized and use good judgment until further orders." By December 30, 2020, Healion, using the username "Tormund Giantsbeard," had joined and begun participating in MOSD chats.

Healion understood that Congress was meeting at the Capitol on January to certify the 2020 Presidential Election. During a video chat for prospective MOSD members with Tarrio and other leaders, which took place in December 2020, Healion posted a message in the chat that said, "What time is the whole political/presidential situation happening that day? With pence and the electoral votes? And are we planning for either an unlikely joyous moment of pence [sic] growing balls?" Healion also asked what gear he needed to buy, which led the leaders to discuss various forms of body armor, as seen below in Image 1.



Image 1

In response to Healion's question about "the list of stuff we need," Enrique Tarrio responded to recommend items such as a plate carrier, while reminding the group not to wear Proud Boys' colors. Rehl asked for a link to stab-proof vests. During the video meeting, the leaders again stressed the need for secrecy and the importance of following the chain of command. Members were told that the group would always have a "strategic objective" and that January 6 would as well. *Nordean,* 21-cr-175 (TJK), Trial Ex. 613-G (Exhibit 7).

In addition to participating in encrypted message groups for MOSD members, Healion also joined another encrypted message group for a small number of Philadelphia chapter members. The encrypted message group was created by Philadelphia chapter president Rehl, and included Healion, Giddings, and Vy ("Rehl Telegram Group"). This message group contained messages from as early as November 19, 2020.

Rehl, Healion, Vy, and Giddings used the Rehl Telegram Group to coordinate their travel to Washington, D.C. for January 6. Their preparations included sharing their blood types. Rehl drove Healion, Vy, and Giddings to D.C. on January 5. They arrived in the evening and checked into the Darcy Hotel.

On January 6, a group of nearly 100 Proud Boys, Healion included, gathered at the Washington Monument. *See* Image 2 (depicting Healion and Vy). Consistent with the directive that had been issued in the encrypted chat for MOSD members, shortly after 10 a.m., Healion gathered with other Proud Boys at the Washington Monument, and—along with other members— was not wearing the Proud Boys' traditional black and yellow colors.



Image 2 (Healion circled in yellow)

At approximately 10:30 a.m., leaders of the group, including Rehl, organized the men into formation and marched away from the planned speeches at the Ellipse and directly toward the Capitol.

As the group marched toward the Capitol, leaders of the march addressed the men, including Healion, through a megaphone, telling them that the police and government had failed them. As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—one of the leaders of the march announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., members of the group taunted them, yelling "treason," and warning the

officers, "don't make us go against you." The group, including Healion, continued to march around the perimeter of the Capitol grounds. They employed radio communications devices and coordinated movements to stay together as a large group. After surveilling the Capitol's perimeter defenses, they lay in wait for approximately 30 minutes until just before the certification was to commence.

The marching group arrived at the Peace Circle, which lies at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

By the time he arrived at the U.S. Capitol, Healion had concealed his face using a black gaiter. *See* Image 3.



Image 3 (Healion circled in yellow)

Near the Peace Circle, one of the leaders of the march led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!" At 12:53 p.m., approximately one

minute after Proud Boy leader Joe Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade. Rehl, Healion, and others who had marched with them also moved forward and crossed onto Capitol grounds with the crowd.

Healion understood that he was not permitted to be on Capitol grounds, but he also understood that he was expected to follow the commands of Proud Boys leadership. Once on Capitol grounds, Healion attempted to remain by Rehl, Vy, Giddings, and another individual (Person-1). The group moved toward the front lines of the rioters, close to the police line. *See* Images 4-6. From his position near the front of the crowd, Healion was in position to see numerous instances where law enforcement officers were assaulted physically and with aerosol sprays.



Image 4, 1:04 p.m.          Image 5, 1:11 p.m.          Image 6, 1:13 p.m.
                          (Healion circled in yellow)

At approximately 1:15 p.m., Healion saw law enforcement place metal bike racks in front of themselves. Healion helped a rioter cross back from the "police" side of the line to the "rioter"

side of the line. *See* Image 7. He understood that the police were using the bicycle racks to try to establish and hold a police line and keep the rioters away from the Capitol Building.



Image 7 (Healion circled in yellow)



Image 7 Close-up (Healion circled in yellow)

Shortly after 1:15 p.m., law enforcement was able to re-form a police line and push members of the crowd away from the Capitol. Healion moved backward with the crowd, and regrouped with Rehl, Vy, Giddings, and Person-1 near the back of the West Plaza.

Around 2:08 p.m., Healion saw other rioters engaging with officers and attempting to pull the bike racks away from the police line. Healion immediately moved to the front of the crowd opposite the line of officers and reached out to try and grab one of the bike racks but was unable to successfully grip it. *See* Image 8.



Image 8 (Healion circled in yellow)

After failing to grab the bike rack, less than one minute later, Healion tried again and reached out toward a bike rack. This time, Healion grabbed the bike rack and yanked it away from

the MPD officer who had his hand on the rack. *See* Image 9. After Healion grabbed the rack, two other rioters also grabbed onto the rack and tried to pull it away from the officer.



Image 9 (Healion circled in yellow)

Shortly after grabbing the bike rack, Healion rejoined Rehl, Vy, Giddings, and Person-1 on the West Plaza. Meanwhile, Rehl sprayed an officer in the face with chemical spray.

By approximately 2:10 p.m., rioters had broken through the police line and made their way to the Upper West Terrace. Shortly thereafter, rioters began to break windows, open doors, and enter the Capitol Building. Healion, Rehl, Vy, and Person-1 followed rioters up a set of concrete stairs to the Upper West Terrace, and once there, the group posed for pictures, including the image below, in which where they are making the "ok" hand gesture used by the Proud Boys. There, Rehl declared, "Civil war started." *United States v. Nordean,* No. 21-cr-175, Trial Ex. 547-5 (Exhibit 8).



Image 1 (Back Row: Rehl, Jeffery Finley, Giddings, Person-1; Front Row: Vy, Healion.

    While standing on the Upper West Terrace, Healion heard the men that he was with state that former Vice President Pence had been "evacuated." Rehl, Healion, Vy, and Giddings discussed what was going on in the Capitol and then decided to go inside.

    Healion, Rehl, Vy, and Giddings entered the Capitol Building at approximately 2:53 p.m. through the Senate Wing Door. A loud alarm was sounding in the doorway, and broken glass was on the ground. Healion understood that he was not allowed on Capitol grounds or inside the Capitol.

    Once inside, Healion, Rehl, Giddings, and Vy entered Senator Jeff Merkley's hideaway office. The men again posed for pictures while making the same Proud Boys hand-gesture, as

shown in Image 10 below, with Vy holding what appears to be a rolled marijuana joint in his left hand.



Image 2 (From left: Healion, Vy, Rehl, Giddings)

After spending approximately twenty minutes inside the Capitol Building, to include the time spent making hand-gestures and posing with what appears to be a joint inside Senator Merkley's office, Giddings, Rehl, Vy, and Healion exited the Capitol Building by climbing out through a broken window.

During the attack on the U.S. Capitol, Proud Boys members posted comments to the MOSD chat group describing and encouraging the ongoing assault. One member posted "Storming the capitol right now!!" a little later, that same member posted to the MOSD group "Got a riot shield!" and "Don't be pushed out we are in the cusp of saving our nation." During the assault, another

member posted "As of 10 minutes ago a group of non PB Patriots were gathering up for their second push inside."

In the hours immediately following the breach of the U.S. Capitol Building, MOSD members continued discussions in the encrypted message group. One participant posted a message that asked whether they needed to go "full 1776" and "continue to escalate and go the 1776 proper route." Healion posted a message in which he commented that the public's reaction to the riot "shows [the Proud Boys] that a lot of them aren't ready to go to the next level. That's probably a bad thing in the long run. . . ."

The evening of January 6, Healion gathered with other members of his chapter, including Rehl, Giddings, Vy, and Person 1. The group celebrated the Proud Boys' role in the breach of the Capitol.

## III.     THE CHARGES AND PLEA AGREEMENT

On July 12, 2023, a federal grand jury returned an indictment charging Healion with five counts, including obstructing, impeding, or interfering with law enforcement during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). On, February 22, 2024, Healion was convicted of this offense based on a guilty plea entered pursuant to a plea agreement.

## IV.     STATUTORY PENALTIES

Healion now faces sentencing on Count One for violating 18 U.S.C. § 231(a)(3). As noted in the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment; a fine of $250,000 pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2), an obligation to pay any applicable interest or penalties on fines and restitution not

timely made, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The final PSR correctly sets forth the Guidelines calculations, PSR ¶¶ 63-73 (ECF No. 69):

Count One: 18 U.S.C. § 231(a)(3)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | <u>10</u> |
| | | **Total** | **10** |
| Acceptance of responsibility (U.S.S.G. §3E1.1a) | | | <u>-2</u> |
| **Total Adjusted Offense Level:** | | | **<u>8</u>** |

*See* Plea Agreement at ¶ 5(A) and PSR ¶¶ 63-73.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The parties agree that § 4C1.1 is not applicable to the defendant since his actions were violent and that he will not seek an adjustment under that provision. *See* Plea Agreement ¶5(C).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 76. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, Healion's Guidelines imprisonment range is 0-6 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the requested term of incarceration.

### A.     Nature and Circumstances of the Offense

Healion willingly joined in a collective effort that brought violence to the Capitol on January 6 in an effort to change the course of American history. As shown in Section II(B) of this memorandum, Healion's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Healion contributed to the chaos and lawlessness by making two attempts to move a bike rack barricade used by police to establish a barrier between the mob and the Capitol, with Healion succeeding on the second attempt. These actions not only weakened the police line but emboldened other rioters to attempt the same conduct. Healion's obstruction took place on the West Front, during a raging battle between rioters and police, and precipitated the collapse of the police line that would lead to further violence still as rioters surged up the Lower West Terrace.

Healion committed these acts with full understanding of Congress's work that day. An upward variance is appropriate to account for the fact that this was not just any act to obstruct police during a civil disorder, but one that occurred with full understanding that Healion was doing his part to interfere with the transfer of power. *See United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66-67 (stating that, even if the defendant's Section 1512 conviction were invalidated, a significant upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"). The fact that Healion showed

his face at the Washington Monument in the morning but concealed it with a gaiter as he breached the restricted perimeter, obstructed police, and broke into the Capitol Building further underscores that he understood exactly what he was doing, and that it was wrong.

Healion's role in the hand-selected cadre of Proud Boys who were MOSD members and planned for January 6 is also aggravating. This group undertook extensive efforts to amass and direct force and violence against the Capitol. In the private, encrypted chatrooms in which Healion participated with his fellow Proud Boys, the men discussed the use of force, including anticipated violence in connection with the certification proceeding on January 6. *See, e.g.,* ECF 64 at 5 ("time to stack those bodies in front of Capitol Hill"). MOSD membership suggests that Healion was of a certain stature in the group, and was committed to a vision of January 6 that went beyond mere attendance at a presidential rally. The support and willingness of those in MOSD, like Healion, to plan for violence and to follow their leadership's commands, no matter what, had an emboldening effect on the entire cohort. Healion's and others' willingness to be led into violence was one of the things that made the Proud Boys' role on January 6 so dangerous, because they were able to unleash collective violence and chaos. And Healion's participation was not mere talk: he actually acted in accordance with the group's expressed intent, interfering with the police and breaking into the Capitol in lockstep with Rehl.

Healion's role as one of the small group of Zachary Rehl's right-hand men that day is further aggravating. That small group made plans together, exchanging blood types, drove to Washington together, marched to the Capitol together, decided to enter the Capitol together, posed for victory photographs together, and celebrated together that night. For his role, Rehl was convicted of seditious conspiracy. Healion's willing participation by Rehl's side no doubt

emboldened and supported Rehl as he helped to lead the collective effort that undermined a fundamental underpinning of American democracy.

Healion's choice to march to and invade Capitol Grounds with other Proud Boys intent on obstruction and violence – and even sedition –made his conduct all the more dangerous and the objective—obstructing the certification—all the more likely to succeed. As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also United States v. Rhodes et al.*, 22-cr-15, 5/25/23 Sent. Tr. 111-12 (quoting *Callanan*, 364 U.S. at 593). Healion's tight-knit group of Proud Boy chapter-mates illustrates the point: he and Rehl both took action against the police, and the group made a unified decision to breach the Capitol.

Finally, it is significant that Healion posed for a celebratory photograph inside Senator Merkley's office, together with his chapter-mates, with Vy holding what appears to be a joint. The rioters who invaded the office throughout the day—when it should have been a workspace for a Senator during the certification of the Electoral College vote—prompted Senator Merkley to post a video at 11:36 p.m. that night chronicling the damage to his office.[5] In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked. He pointed out how the floor was littered with debris. He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall. He said that the

---

[5] The three-minute-long video, available on Twitter at https://twitter.com/SenJeffMerkley/status/1347039504528498688, was rebroadcast by major news outlets.

rioters "left a Trump flag here to mark their presence." Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or joint on the floor. In Senator Merkley's words, one could "count this office trashed."

Entry into a sensitive space, such as a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. While Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office.   A defendant who entered a sensitive space took an extra step to displace Congress and further the dominance of the mob over the will of the people. That person's presence was even more disruptive. Invading the office of a member of Congress, and posing for a celebratory photograph there with a cigarette, represents a show of intimidation, an attempted display of power, above and beyond entering the building. In that moment, Healion and his brothers viewed the office of a member of Congress as their dominion and the dominion of all the other members of the mob. And when they did this, Healion, Rehl, Vy, and Giddings had already seen violence—and participated in it themselves. And yet, they celebrated. Their action shows disrespect for the rule of law and American institutions. That did not end on January 6: after the destruction and chaos of the riot, it appears that Healion wished for more: he posted that it was a "bad thing" that the public wasn't ready to "go to the next level."

In summary, Healion willingly joined a collective effort, through MOSD and through his close association with Rehl, to engage in violence on January 6 and to follow leadership's

commands to bring about the group's desired result. In service of those goals, he personally interfered with law enforcement, breached a sensitive space, and celebrated with his cohort. And he did all this with full knowledge of the certification that day, and with the knowledge that he needed to cover up his face while doing so. The coordination and the context of the offense take Healion's crime beyond the mine-run of Section 231 offenses and the 0-6 months guidelines range, and support a variance here.

### B.  The History and Characteristics of the Defendant

Healion had multiple contacts with police over a four-year span from 2009 to 2012. PSR ¶ 78-82:

- In 2009, the defendant was arrested and charged with disorderly conduct. PSR ¶ 80
- In 2010, the defendant was arrested and charged with possession of a controlled substance. He pled guilty to that offense and entered an Accelerated Rehabilitative Disposition program for 12 months, which included 32 hours of community service and fines. Near the end of that term, court records show that a show cause petition was entered, but the defendant was allowed to remain in the program and finished a couple months later. ¶78.
- In 2011, the defendant was arrested for public drunkenness and similar misconduct. PSR ¶ 81.
- In 2012, the defendant was again arrested for public drunkenness and similar conduct. ¶ PSR 82.

Healion's crimes on January 6 were thus not an isolated event in an otherwise law-abiding life. Moreover, the Court can also consider defendant's choice to affiliate himself with the Proud Boys, a group that placed a premium on violence – violence to which he contributed at the Capitol. While none of these actions generate criminal history points under the U.S.S.G., and Healion's criminal record is somewhat dated, they indicate that Healion lacks any particularly mitigating history or characteristics here.

22

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Healion's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Healion was not only a member of the Proud Boys—a group that placed a premium on violence—he was such a valued member that he was part of the exclusive subset selected to join the "Ministry of Self-Defense" group. This was a group of individuals that Proud Boys leadership knew could be trusted, would follow orders, and could be relied-upon on January 6 to use violence. Indeed, on that day, Healion obeyed leadership's directive not to wear Proud Boys "colors" (black and yellow clothing), marched with leadership from the Washington Monument to the Capitol (lending his presence to their show of force), was near the front of the mob that pushed past the

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

initial barricades at the Peace Circle, grabbed a bike rack barricade away from an officer, and carried out the group's objectives of interfering with law enforcement and Congress's certification of the Electoral Vote. Healion's dedication to the Proud Boys, his demonstrated obedience to their directives, and his actions on January 6, undertaken with awareness of the certification, fully support the government's recommended sentence. *See, e.g., Fonticoba*, 21-cr-638 (TJK), Sentc'g Hrg. Tr. at 66-67 (recognizing that "intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence").

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Healion is deserving of a significantly longer sentence that Christopher Kuehne, whom this Court sentenced to 2.5 months' incarceration. *United States v. Kuehne,* 21-cr-160 (TJK). True, both coordinated with their local Proud Boys chapter, both prepared for violence, both breached the Capitol, and both violated Section 231. Kuehne deleted messages after the fact; Healion sought to conceal his identity that day. But Kuehne was not a member of MOSD, like Healion – the "hand selected" group of Proud Boys who pledged to follow the national leaders, further empowering their effort to sow chaos and violence. Kuehne was not the close associate of one of the leaders of the effort. Perhaps most critically, though, while the government presented evidence that Kuehne prepared for violence, it did not present evidence of Kuehne's knowledge of the certification nor his desire for it to be blocked. And the Court also gave Kuehne credit for being a decorated veteran; Healion has no such distinguished past of public service, and in fact has a criminal record. *See* Gov. Sent. Mem., *Kuehne,* ECF No. 254 at 2-9.

---

seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (Statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Healion's case is also more aggravated than Robert Fairchild's. *See United States v. Fairchild*, 21-cr-551 (TFH). Fairchild, a Marine Corps veteran, also pled guilty to a violation of 18 U.S.C. § 231(a)(3) for his conduct at the Capitol on January 6, 2021. He took part in dragging multiple barriers back from the front line and into the crowd, which helped the growing mob eventually reach the Capitol Building. He also pushed against multiple police officers, individually and as part of a crowd. Fairchild then entered the Capitol Building and chanted "Fight for Trump" while inside. The court sentenced Fairchild to six months' incarceration. Unlike Healion, though, Fairchild was not part of a coordinated group responsible for inciting violence at the Capitol. Inside the Capitol, he did not enter any sensitive spaces. Nor did the government present evidence of his involvement in preparation for violence or, importantly, of his knowledge and intent regarding the certification.

In certain ways, Healion is more comparable to two Proud Boys members sentenced by this Court for violations of Section 231 and 1512: Gilbert Fonticoba and Joshua Pruitt. Fonticoba breached the Capitol grounds and building, helped destroy a black metal fence, and interfered with officers who were trying to stop the crowd's advance because he wanted to stop the Certification of the Electoral College vote. *See* Sent. Mem., *United States v. Fonticoba,* 21-cr-638, (TJK), ECF No. 57 at 2, 5-6, 9-11. Like Healion, he acted in concert with members of Proud Boys who shared in his criminal purpose. Unlike Healion, he had no criminal history at all. The government recognizes Fonticoba's more extensive statements on social media, the fact that Fonticoba, unlike Healion, admitted to acting with the intent to obstruct the certification, and his role at the front of the group of Proud Boys who breached the restricted perimeter. The government's sentencing request is thus far lower than the 48 months this Court imposed in Fonticoba's case. But both were

27

part of MOSD; both were close to leaders of the Proud Boys' January 6 efforts, and both attacked police barricades on January 6; and Healion's statements evince his understanding of what was taking place at the Capitol that day.

The government's request is also far lower than the 55-month sentence the Court imposed against Proud Boys initiate Joshua Pruitt, who pled guilty to violating Section 1512 (and who was also indicted for violating Section 231). *United States v. Pruitt,* 21-cr-23. Pruitt had scorable criminal history and appeared to fire up the mob during several confrontations with police; he came face to face with Senator Schumer at one point. However, unlike Pruitt, who largely acted alone on January 6, Healion was a hand-selected member of the MOSD who coordinated his preparations and actions with the leadership of the MOSD, including the breach of the Capitol. Gov. Sent. Mem., *United States v. Pruitt,* 21-cr-23 (TJK), ECF No. 66.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[9]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Healion must pay $2,000 in restitution, which reflects in part the role Healion played in the riot on January 6.[10] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Healion's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 59.

## VIII.   FINE

The defendant's convictions conviction for violating 18 U.S.C. § 231(a)(3) subjects him to a statutory maximum fine of $250,000. 18 U.S.C. § 3571(b). In determining whether to impose a fine, the Court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases except where the defendant establishes a current and future inability to pay. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

As noted in the PSR, Healion did not provide the Probation Office with requested financial

data. The PSR also notes that the Court has authority to use the corresponding monthly cost for imprisonment put forth by the PSR—$4,147.00—to impose a fine based on the number of months the Court ultimately imposes. PSR ¶ 141.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of fifteen months' imprisonment, 36 months' supervised release, restitution in the amount of $2000, and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ *Kyle M. McWaters*
Kyle M. McWaters
D.C. Bar No. 241625
Assistant United States Attorney
601 D Street NW
Washington, DC 20850
(202) 252-6983
kyle.mcwaters@usdoj.gov